**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

    v.                           No. 1:19-CR-3796-001-WJ

GREGORY JOJOLA,

      Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S REQUEST FOR DOWNWARD VARIANCE

**THIS MATTER** comes before the Court upon Defendant's Sentencing Memorandum in

Support of Downward Variance (Doc. 81), filed March 12, 2021. Having reviewed the parties'

pleadings and the applicable law, a hearing having been held and the arguments of counsel and

the testimony of an expert witness having been considered, this Court **DENIES** Defendant's

request for a downward variance.

## BACKGROUND

Defendant pled guilty to three counts of assault of an intimate partner. While on

methamphetamine, he assaulted his partner by striking, strangulation, and sexual assault[1] which

caused serious bodily injury in the presence of his young children. Under the U.S. Sentencing

Guidelines, Defendant's sentencing range is between 46 to 57 months. Defendant requests a

downward variance. *See* Doc. 80, Doc. 81. The Court held hearings on November 24, 2021 and

---

[1] According to Jane Doe, the Defendant became violent and pulled off her clothes. He pushed her onto the bed and sat on her stomach to restrain her movement. He then placed his hands around her neck and squeezed it, and grabbed and pulled her breasts. Jane Doe stated she agreed to have sex with him hoping that it would make his violent behavior cease. *See* Doc. 72, Presentence Investigation Report.

March 17, 2022 on Defendant's Sentencing Memorandum in Support of a Downward Variance (Doc. 81). At the hearings, Defendant—an enrolled member of the Pueblo of Isleta—argued that a downward variance is warranted based on the disparities in the sentences given to "Indians"[2] for aggravated assault in New Mexico state and federal courts. He argued that if this Court does not consider the fact that he would have received a lower sentence for assault had he been sentenced in state court, his Equal Protection rights will be violated. Alternatively, he argued that the Court has discretion to consider the disparity under U.S.S.G. § 5K2.0(a)(2) and when assessing the sentencing factors of 18 U.S.C. § 3552(a).

## DISCUSSION

Federal criminal jurisdiction is different for Native American Indians than it is for non-Indian Americans. Typically, a non-Indian American charged with a felony such as murder, sexual abuse, or aggravated assault would be tried in state court. Such an individual would be tried in federal court only if the crime involved some federal interest, such as drug trafficking across state lines. This is not the legal structure imposed on Indians: ever since 1885, the Major Crimes Act ("MCA") has conferred federal-court jurisdiction over other offenses that occurred in "Indian country" and were perpetrated by "Indians," while misdemeanors are left to the tribal courts. 18 U.S.C. § 1153(a). Put simply, in the majority of states,[3] misdemeanor offenses

[2] The Court recognizes that the term "Indian" is antiquated and offensive to certain members of various indigenous communities. However, the term holds legal significance as it refers specifically to members of federally recognized indigenous tribes and was the language Congress used when enacting statutes relevant to this matter. In a legal sense, not all Native Americans or American Indians are "Indians," particularly when the individual is part of a tribe with which the federal government terminated its relationship. Federal court criminal jurisdiction over Native Americans typically requires proof that the defendant is an "Indian" and that the offense occurred in "Indian country." Therefore, more politically-correct terms such as "First Nations," "indigenous," or "Native American" do not convey the precise legal meaning of "Indian." The Court uses the term "Indian" for clarity.
[3] Congress has extended state criminal jurisdiction in several states and disclaimed the federal responsibility for safety within Indian country. Those states include Alaska, California, Nebraska, and parts of Minnesota, Oregon, and Wisconsin. Florida, Idaho, Iowa, and Nevada have another type of extended jurisdiction as well.

allegedly perpetrated by "Indians" within "Indian Country" are prosecuted and tried in tribal courts, and felony offenses allegedly perpetrated by Indians within "Indian Country" are prosecuted and tried in federal courts.[4]

Defendant Jojola is characterized as an Indian and an enrolled member of the Pueblo of Isleta, a federally recognized tribe. Based on the factual narrative in Defendant's Plea Agreement,[5] he committed the crimes of assault resulting in substantial bodily injury and assault of an intimate partner by strangling and suffocating in a portion of Bernalillo County, New Mexico that is within the boundaries of the Pueblo of Isleta. Thus, the MCA attached, which is the jurisdictional basis for Defendant being indicted and prosecuted in federal court in the District of New Mexico. Defendant pled guilty and now seeks a downward variance of his sentence on the basis that he is being treated more harshly under the United States Sentencing Guidelines for his assault than would a non-Indian tried for assault in state court. This disparity, he asserts, violates his Equal Protection rights. In other words, he argues that the MCA disproportionately affects the sentences given to Indians. He alternatively argues that this Court should consider the disparity in its discretion under U.S.S.G. § 5K2.0(a)(2) or in its analysis of the sentencing factors under 18 U.S.C. § 3552(a).

I.      *Equal Protection Clause: Facially Discriminatory Statute*

The Fourteenth Amendment provides that "No state shall deny any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. The Equal Protection Clause of the Fourteenth Amendment only applies to the states, but the Due Process Clause of

---

[4] The MCA provides a list of certain, not all, felonies that are subject to federal jurisdiction. *See also McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020) (standing for the proposition that under the Major Crimes Act, there is no state court jurisdiction for felony offenses committed by tribal members on tribal lands).
[5] *See* Plea Agreement, Doc. 65 (filed November 24, 2020).

the Fifth Amendment incorporates a guarantee of equal protection application in the federal system. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

Under the Fifth Amendment's guarantee of equal protection, "all racial classifications imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny" and will pass constitutional muster "only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). One manner of establishing an improper racial classification is to point to a facially discriminatory statue—*i.e.*, by showing that the statute contains an explicit racial categorization. *Id*. at 224. The Supreme Court has already held that the designation of "Indian" is a political, rather than a racial, classification under the MCA. *United States v. Antelope*, 430 U.S. 641 (1977). Thus, it cannot be said that the MCA is facially discriminatory, as political classifications are not suspect classes for purposes of Equal protection challenges. *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion); *Griego v. Oliver*, 2014-NMSC-003, ¶ 26 (noting that only race, national origin, religion, and alienage have been recognized as suspect classes). Defendant takes issue with the Supreme Court's reasoning in *Antelope*, but the fact remains that it has not been overturned and is binding precedent on this Court. Thus, the argument that Defendant's Equal Protection rights were violated based on an explicit racial classification in the MCA fails. As such, the Court will not consider the alleged sentencing disparity on that basis.

II.    *Equal Protection Clause: Neutral Statute*

Defendant next argues that if the MCA is neutral on its face—*i.e.*, it does not contain any explicit racial classifications—then it has been applied in a discriminatory fashion which implicates the Equal Protection Clause. *See Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Arlington*

4

*Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) (providing that a facially neutral law that contains a discriminatory purpose that disparately impacts a disfavored group is unconstitutional). Defendant argues that the MCA (i) is applied in a discriminatory fashion and (ii) was enacted with a discriminatory purpose and disparately impacts Indians. In addition to proving a disproportionate impact under either of these arguments, Defendant must provide evidence that "an invidious discriminatory purpose" motivated the alleged discrimination. *Washington v. Davis*, 426 U.S. 229, 242 (1976). As such, Defendant spent a large portion of his Memorandum discussing the history of the MCA and oppression of Native Americans. However, it remains that a disproportionate *impact* must be shown in order to show a violation of Equal Protection rights. In other words, Defendant must show that a disparity exists between the sentencing of individuals in state court versus Indians being sentenced in federal court for the crime of assault.

In attempting to demonstrate a disparity, Defendant relies on the data gathered by two groups. The United States Sentencing Commission established two advisory groups whose mandate was, in part, to analyze the nature of any sentencing disparities that affected Native Americans. The first group, the Native American Advisory Group ("NAAG"), produced a data report in 2003. *See* United States Sentencing Commission, Report of the Native American Advisory Group (Nov. 3, 2003).[6] The second group, the Tribal Issues Advisory Group ("TIAG"), produced a report in 2016. *See* United States Sentencing Commission, Report of the Tribal Issues Advisory Group, (May 16, 2016).[7]

    a.  <u>The NAAG Report</u>

---

[6] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20031104_Native_American_Advisory_Group_Report.pdf.
[7] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/20160606_TIAG-Report.pdf.

The NAAG was tasked with considering "any viable methods to improve the operation of the federal sentencing guidelines in their application to Native Americans under the Major Crimes Act." NAAG Report, pg. i. It studied New Mexico, South Dakota, and Minnesota, and analyzed a variety of state and federal offenses in those states, including aggravated assault. *Id*. at 12. It made a finding that given similar conduct, Native American aggravated assault defendants received longer sentences in federal courts than state courts. *Id*. at iii-iv. It stated,

> Perhaps more than any of the other offenses included within the Major Crimes Act, it was the sentences for aggravated assault that gave rise to the perception of unfairness in the treatment of Native Americans under the federal sentencing guidelines, which led to the formation of this Advisory Group. This perception is well-founded based on the data reviewed by this Advisory Group. Federal sentences for aggravated assault are indeed longer than state sentences. Because Native Americans are prosecuted federally for assaults, they receive longer sentences than their non-Native counterparts in state court. *Id*.

> As it pertains to New Mexico, the Report concluded:

> When one considers the data from New Mexico, the disparity between state and federal sentences for assault is even more dramatic. The average sentence received by an Indian person convicted of assault in New Mexico state court is six months. The average for an Indian convicted of assault in federal court in New Mexico is 54 months. While the New Mexico statistics are based in part on low level offenses which would generally not be prosecuted in federal court, the difference in sentence length is so great even the elimination of these offenses does not negate the significance of the disparity. The six month versus 54 month difference covers a number of offense levels (15), and thus easily meets the prima facie disparity test. *Id*. at 33.

The NAAG Report "strongly recommended" the Commission reduce the base offense level for aggravated assault by two levels—which it called a "conservative approach"—to eliminate the disparity between state and federal sentences. *Id*. at 34. The Sentencing Commission subsequently lowered the base offense level by one. *See* U.S. Sentencing Guidelines Manual, Supplement to Appendix C, Amendment 663.

The Court cannot make a finding that a sentencing disparity exists based on this Report alone. Most notably, the data in the Report is almost two decades old. Moreover, the Report only analyzed three states and admitted that data from other states with significant Indian populations (such as Arizona, Montana and North Dakota) was not available. The reliability of the data it did analyze is questionable, as it was not controlled for key characteristics such as prior criminal history of defendants. Criminal history scores would be crucial to accurately assessing this data because criminal history scores dramatically impact defendants' sentencing guideline ranges. Additionally, the data did not account for whether sentences were reduced from a more serious crime, or whether sentences were the result of deferred sentences, pre-trial diversion, plea agreements or guilty verdicts in criminal jury trials. NAAG Report, at pg. 13; Doc. 120, Transcript pg. 34-35. Additionally, the NAAG Report data was not defined to only those Native American offenders who met the legal definition of "Indian" and whose crimes were committed within "Indian County" as required for federal jurisdiction under the MCA. In fact, the 2016 TIAG Report critiqued the NAAG on this basis, stating, "the dearth of state sentencing data hampered its ability to document actual sentencing disparities between states and the federal system. At best, the Advisory Group's published 2003 findings underscored the variegated nature of sentencing disparities for Native Americans (note: not "Indian" defendants)." TIAG Report, pg. 18. Plus, Defendant's expert, University of New Mexico Law professor Dr. Barbara Creel, testified that the data has in fact changed since 2003, but she did not know the specifics of how it changed or what the data specifically looks like today. Doc. 120, Transcript, pg. 33. Thus, the Court cannot make a finding based on the NAAG Report that a sentencing disparity exists between Indians and non-Indians in federal and state courts for aggravated assault, and thus that the MCA disparately affects Indians in those sentencings.

b.   The TIAG Report

One of the tasks assigned to the TIAG was to study "whether there are disparities in the

application of the federal sentencing guidelines to American Indian defendants." TIAG Report,

pg. 18. It found that though there were widespread perceptions that sentencing disparities exist

for Native American defendants, the current sentencing data was too sparse to render a

meaningful conclusion. *Id*. at 15; Doc. 120, Transcript pg. 18, 20-21. It noted,

> [U]nfortunately, data limitations still prevent a systematic and comprehensive
> exploration of [] key questions. As was the case in 2003, the lack of meaningful
> demographic and sentencing data from all relevant states, along with the
> difficulties inherent in attempting to compare the elements across federal and state
> crimes, make it virtually impossible to complete a robust comparison of the
> sentences received or served by non-Indian and Indian defendants in federal and
> state courts." TIAG Report, pg. 21.

Professor Creel confirmed this conclusion, stating that the available data did not show a systemic

bias or disparity. Doc. 120, Transcript pg. 21-22. She testified that "the data wasn't clearly kept

by the Sentencing Commission to answer these questions that we had been asked to answer." *Id*.

at 35.

One of the major limitations of the TIAG study—which also restricted the NAAG

study—was that the data used was coded only for the racial/ethnic identity and not for the

offenders' legal status as an "Indian" under the MCA. TIAG Report, pg. 24. Nor was it coded to

determine whether the studied offense was committed in "Indian country." *Id*. While the TIAG

"hinted" at the existence of a disparity that affects Native Americans, it did not conclusively

speak to whether any such disparity affects Indians under the MCA. *Id*. at 21. In other words,

"[W]hile aggregate data strongly suggest that more Native Americans have been subject to

departures and variances in the sentencing calculation, and as a result, may sometimes serve

longer sentences than defendants of other races, they say nothing about bias against tribal

citizens (Indians as defined by federal law)."[8] *Id*. at 24. In analyzing Native American offenses rather than Indian offenses that occurred in Indian country, the Report was overinclusive to a fault. Its broad dataset watered down the potential utility of its conclusions.

Moreover, the data used in the TIAG study was not controlled for key characteristics such as crime committed, defendant age, defendant criminal history, the location of the crime, and any departures or variances granted by the court. *Id*. This was due to the lack of available data. The Report noted, "The TIAG learned that in . . . New Mexico, there is a complete absence of centralized data, including demographic data, maintained by the state judicial and correctional systems." *Id*. at 25. Due to the lack of available data, in assessing assault cases, it only used data from Minnesota to draw comparisons to federal sentencing. *Id*. at 26. While it "confirmed" the findings of the NAAG Report, it stressed that the TIAG's findings "are basic averages that do not control for important differences between cases or defendants, report on results for Native Americans rather than for Indians under federal law, do not take account of diversion or other dispositions available at the state level but unavailable under federal law, and are based on data from a single state." *Id*. at 26-27. It continued,

> [T]he virtual absence of usable empirical data and challenges associated with
> comparing state and federal crimes for the analysis prevented the TIAG from
> undertaking a comprehensive review of potential sentencing disparity issues
> within the federal system and between the state and federal systems. This lack of
> data presents precisely the same dilemma that the Commission's Advisory Group
> faced in 2003 when it studied these matters. Any future Commission advisory
> committee or task force will face the very same challenge unless and until
> changes are made to federal and state-level criminal justice data collection. *Id*. at
> 27.

---

[8] The data shows that in 2014, more Native Americans were given sentences that were above the guideline range than Hispanic, Black, White, and other defendants. It shows that in the same timeframe, fewer Native Americans received below guideline range sentences than any other racial category besides Black individuals. TIAG Report, pg. 23.

The limitations of the TIAG Report are notable and significant because without the proper parameters, no reasonable person can come to the conclusion that a disparity exists due to defendants' status as Indians or due to outside factors. Therefore, based on the foregoing reasons, the TIAG Report does not support the conclusion that a sentencing disparity exists.

Acknowledging the lack of conclusive findings in these studies, Defendant argued that "because the courts witness the disparity first-hand, they are in the best position to take immediate action in sentencing." Doc. 81, pg. 15. He stated, "It is obvious that Indian defendants suffer disproportionately harsher sentences than if they were non-Indian or if they had committed their crimes off the reservation." *Id*. at 16-17. Nevertheless, Defendant offered no evidence of what sentence he would face in state court, and as discussed, the NAAG and TIAG Reports do not sufficiently demonstrate a disparity. He cited without comment to some law review articles, but all were published before the TIAG Report, which the Court finds to be more persuasive than any data in the law review articles. *See, e.g.*, Charles B. Kornmann, *Injustices: Applying the Sentencing Guidelines and Other Federal Mandates in Indian Country*, 13 FED. SENT'G REP. 71 (2000). He also cited to *United States v. Begay*, arguing that the case implies the existence of a disparity. 974 F.3d 1172 (10th Cir. 2020). However, in *Begay*, the trial court refused to hear any evidence of the alleged disparity, as Begay's proffer lacked sufficient detail. *Id*. at 1173. On appeal, the Tenth Circuit noted it was sympathetic to Begay's "concern" about disparities. *Id*. at 1176. Nevertheless, it had no evidence in front of it to conclude that such a disparity existed. Indeed, the TIAG Report even noted that there was widespread perception in federal courts about the existence of a disparity, but it could not conclude that one existed. TIAG Report, pg. 29.

In sum, Defendant failed to offer sufficient evidence of a disparity between Indians and non-Indians for aggravated assault in state and federal courts. Therefore, he has not shown that

his Equal Protection rights were violated by being disproportionately impacted by the MCA in sentencing.

     c.  <u>The Sentencing Commission's Efforts</u>

Defendant seemingly argues that his Equal Protection rights were violated by the failure of the United States Sentencing Commission to gather additional data and research on potential disparities. He asserts that without empirical data, the Guidelines ignore their own approach and cannot be relied upon. Defendant voices his frustrations that "the Commission, to date, has chosen to simply ignore the conclusions and recommendations of TIAG and continues to fail to gather the needed data." However, in its 2016 Report, the TIAG reasonably recommended that the group reconvene every ten years. TIAG Report, pg. 7. The date to reconvene has not yet passed. Moreover, the TIAG voiced concerns that any future report would succumb to the same data limitations, as state governments—not the Commission—were not collecting the sentencing data necessary to answer the TIAG's questions. *Id*. at 27. As such, the TIAG recommended congressional action in order to incentivize states to gather the proper data. *Id*. at 2.

Moreover, in 2018, the Sentencing Commission adopted the TIAG's recommendation regarding analysis of tribal convictions. *See* United States Sentencing Commission Amendment 805, effective date November 1, 2018, *available at* https://www.ussc.gov/guidelines/amendment/805. In specifically responding to the TIAG's concerns regarding vague terminology, the Sentencing Commission added a definition of "court protection order." It also provides that tribal court convictions shall not be counted when calculating a defendant's criminal history score—which benefits tribal members—but may be considered in granting an upward departure after taking 6 factors into consideration that aim to ensure the reliability of a tribal conviction and prevent sentencing disparities. *Id*. Therefore, the

alleged lack of action on the part of the Sentencing Commission does not support the conclusion that Defendant's Equal Protection Rights were violated.

III.     *U.S.S.G. § 5K2.0(a)(2) and 18 U.S.C. § 3553 Considerations*

Defendant next argues that the Court has discretion to consider a sentencing disparity based on a disagreement with the Guidelines under U.S.S.G. § 5K2.0(a)(2). That provision allows a departure if certain exceptional circumstances are present which have not been taken into account by the U.S. Sentencing Guidelines. However, as discussed, Defendant did not prove the existence of a disparity that is relevant to his case in light of the lack of available data. The NAAG and TIAG indicated potential issues with the sentencing of Indians, but Defendant even admits that the groups determined that additional data was needed to adequately assess sentencing disparities. The Court agrees that more data is necessary. However, when considering Defendant's request, this Court should not grant a downward variance based simply on perception and non-conclusive findings of an alleged disparity.

Moreover, even if the Court accepted the proposition that a sentencing disparity generally exists, Defendant did not present the Court with information about what sentence he, specifically, would have received in state court. Defendant is charged federally with assault resulting in substantial bodily injury to an intimate partner and assault of an intimate partner by strangling and suffocating. Even overlooking the discussed issues with the data in the NAAG and TIAG Reports, neither reported on any potential disparities with regard to these specific types of assault. Distinguishing between specific types of assaults is crucial in order to accurately compare sentences. For instance, the TIAG noted that "Minnesota defendants who were convicted of aggravated assault involving a weapon received a lower state sentence than similarly situated federal defendants. Minnesota defendants who were convicted of aggravated

assault resulting in serious permanent injury received comparable, if not higher, state sentences than similarly situated defendants." TIAG Report, pg. 26. It is not possible to infer that the NAAG or TIAG used data related to the offenses with which Defendant is charged. The effective date of Defendant's specific applicable definitions of assault is March 7, 2013. *See* PL 113-4, March 7, 2013, 127 Stat 54, Sec. 906 Amendments to the Federal Assault Statute, Violence Against Women Reauthorization Act of 2013. The state of New Mexico's definition of aggravated assault only clarified the definitions of "suffocation" and "strangulation" in 2018. *See 2018 New Mexico Senate Bill No. 61. New Mexico Fifty-Third Legislative Session Second Session 2018*. Thus, neither the NAAG nor the TIAG could have made meaningful comparisons in their 2003 and 2016 reports.

Defendant alternatively argues that the Court should consider the sentencing disparity under 18 U.S.C. § 3553(a). He argues that *United States v. Begay* precludes the consideration of a disparity only under § 3553(a)(6), but not under the other factors of 3553(a). 974 F.3d 1172 (10th Cir. 2020). The Court need not reach this issue, as Defendant did not adequately prove the existence of a disparity.[9] The Fourth Circuit dealt with a similar situation in *United States v.*

---

[9] The Court notes that while *Begay* implied a sentencing disparity could be relevant to other sentencing factors, it also stressed the importance of the Court's duty not to create a sentencing disparity among federal defendants—such one in which federal Indian defendants receive lower sentences for aggravated assault than do federal non-Indian defendants. In *Begay*, the Court noted, "We concluded that the purpose of § 3553(a)(6) is not to prevent disparities between state and federal sentences, but rather to prevent disparities in sentences among federal defendants. Were the sentencing court to conform a federal sentence to a state sentence, it would undermine this goal." 974 F.3d at 1176; *see also Clark*, 434 at 687 ("The Guidelines sought to avoid only the unwarranted disparities that existed in the federal criminal justice system . . ."). In *Clark*, the Court stated,

[T]he result of according 'great weight' to these sentences that defendants would receive in the state courts in which their respective crimes were committed (if other district courts were to follow suit and their reasoning to be accepted by this court) would be a sentencing regime that actually produced, rather than avoided, sentencing disparities among federal defendants, because federal defendants who engaged in the same criminal conduct would receive different sentences merely because they committed their federal crimes in different states. *Clark*, 434 at 687.

While Defendant Jojola's argument deals outside of § 3553(a)(6), the purposes of that subsection would be undermined by granting a downward variance. It would be contradictory to (a)(6) to grant a variance under another subsection that could create a disparity among federal defendants.

*Clark*, 434 F.3d 684 (4th Cir. 2006). Though it was analyzing whether a disparity could be considered under § 3553(a)(6), and this Court would be determining whether one could be considered under any of the other subsections of § 3553(a), the facts and analysis are applicable to the case at hand. In *Clark*, the Fourth Circuit criticized the trial court's consideration of an alleged disparity based on a federal probation officer's unsworn testimony that another officer estimated using "general facts" that the defendant would have received a sentence of six months had he been in state court. *Id*. at 685. Similarly, Defendant Jojola offered only outdated limited data that does not support the conclusion he sets forth.

### CONCLUSION

In sum, Defendant has failed to prove the existence of a sentencing disparity between Indians in federal court and non-Indians in state court charged with the relevant assault statutes. Without proof of a disparity, this Court cannot conclude that his Equal Protection rights were violated, nor can it use its discretion to grant a variance based on U.S.S.G. § 5K2.0(a)(2) or § 3553(a). For the foregoing reasons, the Court **DENIES** Defendant's request for a downward variance.

**IT IS SO ORDERED.**

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE